IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
CENTRAL DIVISION

| | | |
|---|---|---|
| TAMMY DRUM, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | Case No. 06-4279-CV-C-NKL |
| LEESON ELECTRIC CORPORATION, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| REGAL-BELOIT ELECTRIC MOTORS, INC., | ) | |
| | ) | |
| Defendants. | ) | |

**ORDER**

Plaintiff Tammy Drum brought this action against her employer, Leeson Electric Corporation ("Leeson") and Regal-Beloit Electric Motors, Inc. ("Regal-Beloit"), asserting claims for violation of the Equal Pay Act ("EPA"), 29 U.S.C. § 206, gender discrimination under Title VII of the Civil Rights Act (Title VII), 42 U.S.C. §§ 2000e, et seq., and gender discrimination under the Missouri Human Rights Act (MHRA), §§ 213.010, et seq. The case is before the Court on Leeson's and Regal-Beloit's motion for summary judgment [Doc. # 71]. For the reasons set forth below, the Defendants' motion is GRANTED.

**I.     Background**

Plaintiff Tammy Drum ("Drum") is a female who is and has been employed at Leeson's manufacturing plant in Lincoln, Missouri, for a number of years. (Frihart Dec. ¶ 2). Before December 31, 2006, Leeson had manufacturing plants in Lincoln, Missouri; Neillsville, Wisconsin; Black River Falls, Wisconsin; and Grafton, Wisconsin. (Frihart Dec. ¶ 2). RBEM is a Wisconsin corporation which does business in Missouri. Leeson and RBEM are subsidiaries of Regal-Beloit Corporation ("Regal-Beloit"). (Mikulecky Dec. ¶¶ 2, 4-6.)

Drum's previous employer was the Sandor Company. When Leeson acquired the Sandor Corporation, it hired Drum as a personnel administrator at the annual salary of $17,400. That was the same salary she had been paid by Sandor. (Frihart Dec. ¶ 3). Drum worked her way up and between April 1,1998 and March 1, 2005, Drum worked as the Human Resources Manager ("HRM") at the Lincoln plant. Leeson gave Drum regular annual raises. When she left the position of HRM, her salary was $41,548.

In November 2005, Leeson promoted Drum to a temporary position in a corporate Lean Six Sigma Black Belt quality improvement program. (Frihart Dec. ¶ 3). Drum had been recommended for the promotion by Daniel Kees, the plant manager of the Lincoln facility of Leeson. (Kees Dec. ¶¶ 11-12.).

After Drum accepted the promotion from HRM to Black Belt, Leeson began a search to find a new HRM for its Lincoln facility. (Schmitz Dec. ¶ 6.). According to Leeson, it conducted this search under the terms of Regal-Beloit's new policy of finding a qualified candidate first and setting the salary second. (Mikulecky Dep., 138).

2

Previously, Leeson set salaries for newly hired employees by first identifying a target salary for a given position, typically one slightly under industry averages; and second, finding someone willing to do the given job for that salary. (Mikulecky Dep., 138). Leeson's new policy was accompanied by a "broad band salary structure." (Hellrood Dep., 49-50). This "broad band" structure would classify certain exempt employees for purposes of assessing market-driven salaries. *Id*. The record is conflicting as to whether "the broad bands" had salary ranges attached to them and when the "broad band" structure was actually implemented. *Id.*; (Mikulecky Dep., 133); (Schmitz Dep., 32-33).

Fred Schmitz ("Schmitz"), Leeson's Regional Human Resources Manager and Drum's direct supervisor, had primary responsibility for finding Drum's replacement, although the final candidate selected had to be approved by the Vice President of Human Resources Operations, Dennis Mikulecky ("Mikulecky"). (Schmitz Dec. ¶¶ 7-8; Mikulecky Dec. ¶ 13). The HRM advertisement of Leeson read as follows:

> Regal-Beloit Corporation, Electric Motors Group (formerly known as Motor Technologies Group - Leeson Electric) has an immediate opening for a Human Resource Manager. The successful candidate will have overall human resource responsibility for our Lincoln, MO, facility (200 employees). This electric motor manufacturing plant will provide the successful candidate an opportunity to broaden their HR generalist abilities. This position requires a dynamic and results-orientated individual with a minimum of 3 years of direct Human Resource Management and Safety experience, preferably in a positive employee relations manufacturing environment. Successful candidate will have as a minimum a Bachelor's Degree in Human Resources or related field. A PHR/SPHR designation, Lean or Six Sigma Certification and some supervisory experience is desirable. Qualified candidates will have proven abilities in all aspects of human resources including: safety and workers compensation, employee relations, recruitment and benefits administration. (Schmitz Dec. 10).

3

Fourteen men applied for the HRM position; thirteen stated they had a bachelor's degree. (Schmitz Dec. ¶¶ 14-16, 18-19, 22-24, 26, 29-33, 34). Six women applied for the HRM position; two stated they had a bachelor's degree. (Schmitz Dec. ¶¶ 13, 17, 20-21, 25, 28, 35). Schmitz selected four male external candidates to interview and one internal female candidate, J.F. (Kees Dep., 80-81; Schmitz Dep., 137, 143-44, 184, 297). The resumes of each of the four male candidates who were interviewed for the HRM position reflect that each had a bachelor's degree and experience in both human resources and in safety. (Schmitz Dec. ¶ 15, 27, 30, 32, 38). At Schmitz's request, Drum interviewed one of the male candidates, Mr. V., telephonically and, subsequently, Drum indicated to Schmitz that she believed Mr. V. was qualified for the HRM position. (Schmitz Dec. ¶¶ 42 - 43.). Schmitz then interviewed Mr. V. in person. (Schmitz Dec. (ex. 5) ¶ 44). The parties vigorously dispute Mr. V.'s availability for the Lincoln, Missouri, HRM position. Mr. V. had both a bachelor's degree and a master's degree in Business Administration, was seeking an annual salary of approximately $50,000, and at the time he applied, he had approximately 20 years' experience as a HRM in manufacturing. (Schmitz Dec. ¶¶ 30, 41). Mr. V. also had qualifications specific to human resources management. *Id*. During his interview with Schmitz, Mr. V. indicated that he would not know for a few months whether he would be interested in leaving his current position as a HRM at an automotive parts manufacturing facility in St. Louis and that he had applied for the HRM position at the Lincoln facility because he was concerned that the plant at which he was employed might be shut down if his employer did not get a large contract with a major

4

automotive company. (Schmitz Dec. ¶¶ 45, 47). Because Mr. V. did not appear to be ready to accept the HRM position at Leeson's Lincoln plant at that time, Mr. Schmitz looked to other candidates to fill the position. (Schmitz Dec. (ex. 5) ¶ 48). Drum states that Mr V. made no indication to her that he was waiting on news from his current employer. This, however, does not create a disputed issue of material fact about Mr. V.'s availability.

Schmitz also selected HRM candidate Thomas Crosier ("Crosier") for an interview. (Drum Dep., 182). Crosier earned a B.A. in communications arts from Marist College and a Professional in Human Resources Certification from the Society for Human Resources Management. (Schmitz Dec. ¶ 15). Crosier previously worked as a HRM for HCP Packaging USA, Inc., from February 2005 through September 2005, and before that, had been a Human Resources Supervisor/Sr. HR Representative at a manufacturing center of Osram Sylvania from November 2000 to February 2005. (Schmitz Dec. ¶ 15). The President and CEO of HCP Packaging signed a letter of recommendation drafted by Crosier, indicating that Crosier's position with HCP had been eliminated as part of a significant downsizing of HCP's workforce and recommending Mr. Crosier without reservation for any human resource position for which he was qualified. (Schmitz Dec. ¶ 15). Crosier was unemployed when he applied for the Leeson HRM position.

After interviewing Crosier, Mikulecky approved offering the position to Crosier. (Mikulecky Dep., 214). On December 20, 2005, Schmitz sent an email to Drum, Kees and Mikulecky, stating:

5

Dennis has conducted a telephone interview with Tom today. Dennis concurs with us and is satisfied that Tom would bring the necessary talents to handle the position in Lincoln very well. I will conduct telephone references with former employers. Assuming these check out I will put together an offer to him with Dan and Dennis's concurrence. If accepted he will have a drug test and start with you asap, right after January 1 if possible. Regarding [J.F.'s][1] interest, with the years of direct HR experience and the bachelor's degree that Tom has he is better qualified. I will address a personal letter of regrets to her if we are lucky and Tom accepts. If he doesn't, she continues as an active candidate. (Leeson Ex. M).

Drum responded via email to Schmitz and carbon copied her email to Kees and Mikulecky: "Sounds like a plan! Thanks Fred. Keep me posted." *Id*. Although Crosier put in his application a "negotiable" salary range between $55,000 and $70,000, Schmitz offered Crosier the HRM position with an annual salary of $60,000 after consulting with Mikulecky. (Crosier Dep., 53 - 54). Mikulecky stated that in determining the salary to offer Crosier, he "went back to his previous salary, which I believe was 62,400, and that was a salary that I felt we needed to be competitive . . . ." (Mikulecky Dep., 175). Schmitz testified "most likely [he] proposed" the $60,000 to Mikulecky. (Schmitz Dep., 210, 217). Crosier's previous employer, HCP, paid him $78,000, while Osram Sylvania had paid him $62,400. In response to Leeson's initial offer, Crosier requested $65,000. Schmitz responded, offering Crosier an annual salary of $62,500 as a compromise and Crosier accepted. (Crosier Dep., 57-58). On January 12, 2006, Drum discovered that Crosier was being paid $62,500 a year. (Drum Dep., 199 - 200).

---

[1] J.F., the internal female candidate, served as the Human Resources Assistant at the Lincoln facility at the time Drum served as HRM. Ms. F. did not have a bachelor's degree or any experience as a HRM. (Schmitz Dep., 136).

On January 16, 2006, Drum filed a problem-solving procedure form in which she complained about "pay inequities" between male and female managers at Leeson. (Kees Dec. ¶ 43). Specifically, Drum complained that her ending annual salary as HRM was $41,549, whereas Crosier was hired at an annual salary of $62,500. Kees forwarded Drum's problem-solving request to Schmitz, noting that they had a "a serious situation with Tammy Drum in that she found out that Tom Crosier, her replacement as HR Manager, was brought in at a higher salary than she was receiving." (Kees Dec. ¶ 43). The following day, January 17, 2006, Mikulecky sent an email stating "[w]e are going to get our facts together before anything else. If necessary, we will get legal counsel before responding. This is a very serious matter that needs to be investigated and responded to." (Schmitz Dec. ¶ 73). On January 24, 2006, Leeson provided Drum with a written response to her problem-solving request, which contained an outline of Drum's salary history reflecting that Leeson had increased her salary from $17,400 to $45,600 over eight years, explaining that while Drum was recruited locally for an entry-level position, Crosier was recruited nationally for a managerial-level position. (Schmitz Dec. ¶ 80). Drum appealed Leeson's response to her problem-solving request. (Schmitz Dec. ¶¶ 81, 82). In her appeal, Drum stated that she felt that the reason she had been given higher than average pay raises was "because they (management) knew [she] was underpaid vs. other male staff members" and in response to Leeson's explanation that it had to pay Crosier a salary more consistent with national averages for a HRM in order to attract him, Drum stated:

7

Case 2:06-cv-04279-NKL   Document 99   Filed 02/25/08   Page 7 of 16

> This confirms the fact that you could not hire someone of my caliber/qualifications without paying a more fair/equivalent wage for the market. If you research the wage data for this area relative to HR Managers, you will find:
> Springfield, Missouri Mean Annual $65,000
> West Central, Missouri Mean Annual $63,751 (Schmitz Dec. ¶ 82).

After receiving Drum's appeal, Mikulecky arranged a telephone call between himself, Drum and the Human Resources Management System Leader for Regal-Beloit, Terry Hellrood ("Hellrood"). (Hellrood Dep., 7-8). During this telephone discussion, Drum told Hellrood and Mikulecky that although she had received better salary raises than most of the other staff at the Lincoln plant and was within her pay range, it was not good enough to get her salary to market rate. (Hellrood Dec. ¶ 2; Mikulecky Dec. ¶¶ 27, 29). Mikulecky explained to Drum that it was true that employees joining the company from the outside often get up to "market rate" faster than employees who come-up through the ranks at the company, but that employees who come-up internally build wealth in other ways, such as in 401(k) contributions, disability insurance coverage and vacation accrual. (Hellrood Dec. ¶ 3; Mikulecky Dec. ¶¶ 27, 30). At the end of the telephone call with Drum and Hellrood, Mikulecky told Drum that the company could not go back and change what Drum received as the HRM, but might be able to provide her with another salary increase in the Black Belt role in the interest of retaining her long-term as an employee. (Hellrood Dec. ¶ 6; Mikulecky Dec. ¶¶ 27, 34).

Leeson concluded the problem-solving discussion with Drum on February 22, 2006, by stating that it recognized that as Drum received Black Belt training, she would

8

become more marketable to a greater number of companies, in a multitude of industries and accordingly, in an effort to retain Drum, Leeson would increase her annual salary on March 1, 2006, to $50,200. Mikulecky told Drum "to provide whatever survey data she could find to support further salary adjustments as a Black Belt." (Mikulecky Dec. ¶ 27). Drum filed a charge of gender discrimination with the U.S. Equal Employment Opportunity Commission ("EEOC") on May 23, 2006 (Frihart Dec. ¶ 7), and, subsequently, filed this suit.

## II.  DISCUSSION

To establish a violation of the Equal Pay Act and Title VII for unequal pay for equal work, the plaintiff must prove that (1) plaintiff was performing work which was substantially equal to that of male employees considering the skills, effort and responsibilities of the jobs; (2) the conditions where the work was performed were basically the same; and (3) the male employees were paid more under such circumstances. *Broadus v. O.K. Industries, Inc.*, 226 F.3d 937, 941 (8th Cir. 2000).[2]

The Court assumes without deciding that Drum has established a *prima facie* case that the Equal Pay Act was violated. (Doc. 72, 29).[3] Once a plaintiff has met this initial burden, the defendant may raise one of four affirmative defenses to justify the wage differential: (1) a seniority system; (2) a merit system; (3) a "system which measures

---

[2]Drum originally alleged unlawful pay disparity with her predecessor in the Lean Six Sigma Black Belt program, Jeff Ulmer, but abandoned those claims in her response to Leeson's motion for summary judgment. (Doc. 82, 42).

[3]Leeson makes the same assumption in its motion for summary judgment.

9

earnings by quantity or quality of production"; or (4) "any other factor other than sex." 29 U.S.C. § 206(d)(1). Leeson argues that it has established the fourth affirmative defense as a matter of law: Leeson hired Crosier because he was the most qualified candidate and Crosier required an annual salary of $62,500. The requirements of this affirmative defense are not met unless the wage differential is unrelated to sex. *Ridgway v. United Hospitals-Miller Div.*, 563 F.2d 923, 926 (8th Cir. 1977) (citing *Hodgson v. Security National Bank*, 460 F.2d 57, 59 (8th Cir. 1972)).

Employers' affirmative defenses are examined under the principles articulated by the Eighth Circuit in *Taylor v. White*, 321 F.3d 710 (8th Cir. 2003). In *Taylor*, the Eighth Circuit held that an employer could assert prior salary and, by implication, other marketplace wage pressures, as a non-gender based factor justifying different wages for men and women. "Given this facially broad exception, we are reluctant to establish any per se limitations to the 'factors other than sex' exception by carving out specific, non-gender-based factors for exclusion from the exception. *Id. at* 718. At the same time, the Eighth Circuit acknowledged that a market force theory could not be used to justify lower wages for women "simply because the market might bear such wages," *Id.*, thereby perpetuating historically lower wages for women. *Id.* (citing *Corning Glass Works v. Brennan*, 417 U.S. 188, 205 (1974). The Eighth Circuit concluded by finding that the sole issue is "whether the asserted defense is based on a "factor other than sex.'" *Id.* at 719.

Drum has set forth no evidence that raises a material dispute of fact contradicting Leeson's claim that Crosier was given a higher wage because he said he would not come for a lower wage.[4] Although Crosier was unemployed because of a reduction in force, desired to move to Missouri and stated a "negotiable" salary range of $55,000 - $70,000, Crosier rejected Leeson when it offered him $60,000.[5] (Schmitz Dep., 185-86). Drum concedes that a salary of $63,751 represented the local, average HRM salary (Schmitz Dec. ¶ 82), and there is no evidence that Leeson disbelieved Crosier when he said he would not come for $60,000. Furthermore, there is no evidence that a better qualified woman had applied for the position.[6] Even if Mr. V. was a better qualified candidate and was available for the position, that would not raise an inference that sex was a factor in Leeson's decision because he, like Crosier, is a man. In sum, failing to "low-ball" its salary bid to Crosier is not evidence that Leeson chose its offer based on Crosier's sex. While Drum speculates that Leeson generally thought men were worth more than women, speculation and generalization will not make a submissible jury case under Eighth Circuit

---

[4] The Court will not consider Drum's generalized assertions as to pay differentials between male and female exempt employees as Drum has not laid proper foundation for a statistical comparison. *See Hazelwood School Dist. v. United States*, 433 U.S. 299 (1977).

[5] In his most recent position before coming to Leeson, Crosier made $78,000, but made $62,400 in the position he left in February 2005.

[6] Drum asserts on the basis of a review of resumes that female candidates M.S. and M.A. would have been qualified for the HRM position, but she does not assert that they were more qualified than Crosier, and no reasonable juror could find that they were. While Drum speculates about the qualifications of other potential candidates, she has presented no evidence that there were other more qualified female candidates that were overlooked by Leeson during the search for Drum's replacement.

11

precedent in the context of gender discrimination. *Okruhlik v. Univ. of Ark.*, 395 F.3d 872, 878 (8th Cir. 2005).

In support of its statement that its new policy explains the pay differential between Drum and Crosier, Leeson states that "since 2005, every new HRM hired from the outside under the new policy has been given a higher salary than that of the former HRM except one, who was given the same salary." (Mikulecky Dec. ¶ 44-50). Regal-Beloit names the following new hires: at RBEM's facility in Fort Wayne, Indiana, Jennifer Badel (female) was given a starting annual salary of $70,000 when she replaced Becky Tome (female), who had been making $60,000 a year as the HRM; at the Regal-Beloit facility in Union Grove, Wisconsin, Carol Shraw (female) was given a starting annual salary of $68,000 when she replaced Tom Gehrand (male), who had been making $57,600 a year as the HRM; at Leeson's Black River Falls, Wisconsin, facility, Patty McSwain (female) was given a starting annual salary of $68,000 when she replaced Jeffrey Lientz (male), who had been making $60,000 a year as the HRM; Mr. Lientz's $60,000 a year starting salary was also higher than his predecessor, Jeni Raese (female), who had been paid $47,800 a year as the HRM; at Regal-Beloit's facility in Aberdeen, South Dakota, Peggy Canter (female) was given a starting annual salary of $55,000 when she replaced Kim Remily (male), who had been making $45,000 a year as the HRM. The single exception was Peggy McCaslin (female) who was given the same starting annual salary as her predecessor Linda Hodges (female) for serving as the HRM at Regal-Beloit's facility in Indianapolis, Indiana. (Mikulecky Dec. ¶¶ 44-50; Mikulecky Dep., 236-237).

Drum correctly points out that this pattern largely developed after her grievance and she claims it occurred because of her grievance. But Drum has not pointed to evidence that before her grievance, men were being brought in at market rates and women were not or that women were being paid less than similarly situated males in the Leeson plant. Instead, she has presented disputed evidence about the timing of Leeson's change in hiring practice from a policy to select a candidate who was willing to work for less than the market rate to a policy of hiring at market rate.[7] Nonetheless, Drum does not dispute Mikulecky's claim that he announced the policy change to the "Regal-Beloit leadership" in February, 2005, and documentary and deposition evidence suggest that the old salary ranges necessarily co-existed with the new hiring philosophy while Leeson made its transition to new salary bands. According to Crosier, a pay range existed for the position when he took over and he indicated that Drum's salary of $41,549 was in the low end of the range and his salary of $62,500 "would have been probably above the midpoint for the range . . . ." (Crosier Dep., 168-69).[8]

---

[7]Kees, the plant manager, stated that there was an established salary range for the HRM position at the Lincoln, Missouri, plant (Kees Dep., 74-75), but Mikulecky and Schmitz state that the salary ranges had been abandoned. (Mikulecky Dep., 107-08); (Schmitz Dep., 32). However, the salary ranges appeared to have been updated as late as December 29, 2005. (Mikulecky Dep., 109). Other testimony suggests that the salary ranges were replaced by a new "broad band" system which took "a considerable period of time." (Mikulecky Dep., 69-75).

[8]Leeson claims that the salary range table is inadmissible because "it is not identified in or attached to an affidavit" and therefore does not meet the requirements for consideration set forth in Fed. R. Civ. P. 56(e). However, Leeson does not dispute the authenticity of the salary range tables and there is sufficient circumstantial evidence of authenticity in Hellrood's testimony to permit consideration of Exhibit 4. *See Westborough Mall v. City of Cape Girardeau, Mo.*, 693 F.2d 733, 738 n. 2 (8th Cir. 1982); (Hellrood Dep. 46).

13

Even this timing dispute concerning the change in salary practices by Leeson, however, does not support an inference of gender discrimination in the hiring of Crosier because it is undisputed that the change in policy was at least defined, if not officially implemented, when Crosier was hired. No reasonable juror could conclude that this new policy was invented in response to Drum's grievance or to permit Leeson to hire a man at a higher rate than Drum was receiving. Thus, any dispute about when the new hiring plan was adopted is not material.

Finally, Drum argues that even if Leeson is permitted to raise market salaries as the justification for its decision to hire Crosier at a much higher salary than it paid Drum for the same work, Leeson has the burden to show that the market does not reflect historic gender discrimination. In other words, Drum argues that Leeson must prove that Crosier's earlier salary was not itself a product of gender discrimination. The Seventh Circuit, in *Wersing v. Dep't of Human Services, State of Illinois*, 427 F.3d 466, 470-71 (7th Cir. 2005), has tacitly held otherwise, requiring a plaintiff to present some evidence that historical patterns continue to exist in the market on which an employer relies to justify a pay differential. That court held that it was not enough to simply point to broad, empirical studies showing that men, on the whole, are paid more than women. In addition, the Eighth Circuit did not impose such a requirement in *Horner v. Mary Institute*, 613 F.2d 706 (8th Cir. 1980), when it held that a male PE teacher could be paid

14

more than a female PE teacher without running afoul of the EPA, if the employer showed that the male's experience made him the best person available for the job *and* because the higher salary was necessary to attract him to the job. Plaintiff has not presented any evidence that Crosier's prior salary was higher because of historic patterns of discrimination, much less that Leeson was aware that gender discrimination had affected Crosier's prior salary.[9]

On this record, it is pure speculation to suggest Leeson made its choice because Mikulecky or Schmitz subconsciously thought men were worth more than women. If, for example, Drum had shown that prior to the change in hiring practices, men were being paid market rates when recruited from the outside, but women were not, there would be a material dispute of fact about the sincerity of Leeson's reason. Instead, Drum concedes that a salary of $63,751 represented the local, average HRM salary and, by implication, was an appropriate salary for the position. Reading the evidence in the light most favorable to Drum, she has raised no issue of material fact as to Leeson's defense. In short, Drum has established that she was underpaid but not for any unlawful reason.[10]

---

[9]That is not to say that the burden of persuasion on this issue shifts from an employer to a plaintiff. A plaintiff, however, is required to bear the burden of producing evidence that vestiges of historical discrimination continues to infect the relevant employment market after an employer has shown as a matter of law that market forces required a higher salary for a woman's replacement. After a plaintiff produces that evidence, the employer bears the ultimate burden of proving that the male employee's salary was based on a factor other than sex.

[10]While Drum was clearly underpaid for her work, according to the local market for human resource managers, a Court cannot second-guess employers' non-discriminatory personnel decisions. *See Hutson v. McDonnell Douglas Corp.,* 63 F.3d 771, 780-81 (8th Cir.

15

Because sex was not a factor in Leeson's decision to pay Crosier more, the Court need not reach Leeson's additional arguments regarding statute of limitations or punitive damages.

## III.  CONCLUSION

For the reasons stated above, the Court GRANTS Regal-Beloit's motion for summary judgment [Doc. # 71].

s/ Nanette K. Laughrey  
NANETTE K. LAUGHREY  
United States District Judge

Dated:  February 25, 2008
Jefferson City, Missouri

---

1995) (noting that discrimination laws do not give courts authority to act as super-personnel departments); *See also Regel v. K-Mart Corp.,* 190 F.3d 876, 880 (8th Cir. 1999) (explaining that a company's exercise of its business judgment is not a proper subject for judicial oversight).